**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| GREAT LAKES DREDGE & DOCK CO., LLC | : |
| | : |
| v. | : Civil No. CCB-14-1450 |
| | : |
| PUERTO RICO ELECTRIC POWER AUTHORITY, et al | : |

**MEMORANDUM**

Great Lakes Dredge & Dock Co., LLC ("Great Lakes"), seeks exoneration or limitation of liability under 45 U.S.C. § 30505 for claims arising out of its dredging of the Martin Peña canal in San Juan, Puerto Rico. The Puerto Rico Electric Power Authority ("PREPA") has filed such a claim. It now moves under Supplemental Admiralty Rule F(7) to increase the security that Great Lakes previously deposited with the court. That motion has been fully briefed, and no hearing is necessary to its resolution. *See* Local Rule 105.6 (D. Md. 2014). For the reasons explained below, it will be granted.

**BACKGROUND**

In late June 2010, the United States Army Corps of Engineers ("Corps") hired Dragados USA ("Dragados") to complete a project in San Juan, known as the "Rio Puerto Nuevo Flood Control Project Margarita Channel Improvements and Miscellaneous Features." (*See* Mot. Increase Security Ex. B, Mendoza Decl. ¶ 4, ECF No. 25-4.) Dragados, in turn, hired Great Lakes to complete some of the dredging work Dragados had contracted to perform. (*See id.* at ¶ 5; *see also* Mot. Increase Security Ex. B, Mendoza Decl. Ex. 2, Great Lakes Subcontract Art. XXXVI & Ex. C, Subcontract Scope, ECF No. 25-5.) The subcontract between Dragados and

1

Great Lakes incorporated by reference the contract between Dragados and the Corps, which was described as the "Contract Documents." (*See* Great Lakes Subcontract Art. 1.2.) In that subcontract, Great Lakes "agree[d] to be bound to [Dragados] by all items of agreement between [Dragados] and the [Corps] in the Contract Documents and to assume towards [Dragados] all obligations and responsibilities that [Dragados] by those instruments assumes toward the [Corps]." (*See id.*) To perform the subcontract, Great Lakes used its Dredge 51, as well as several other vessels. (*See* Mendoza Decl. ¶ 6; *see also* Mendoza Decl. Ex. 3, Quality Control Report 6/29/2011, ECF No. 25-6.) The subcontract provided a separate line-item price for mobilization and demobilization, dredging, turbidity monitoring, and debris removal for dredging. (*See* Great Lakes Subcontract Ex. C.)

On June 29, 2011, Great Lakes completed a quality control report that indicated it had "dug up underwater cables in A/S #2 on two separate occasions—delaying dredging each time." (Quality Control Report 6/29/30 at 2.) On that day, explained a subsequent report,

> the dredge encountered a power cable in A/S #2. The dredge commenced to pull on the cable with the bucket in an attempt to dislodge it from the dig area. The cable proved to be extensively long (the total length remains unknown), and attempts to remove it were abandoned. Later in the day the dredge encountered another cable in A/S #2. Instead of pulling on the cable, the dredge moved to another dig area and resumed operations.

(Opp. Mot. Increase Security Ex. 1C, Quality Control Report 6/30/2011 at 2, ECF NO. 32-4.) A chain of emails sent the next day suggests that Great Lakes discussed the matter with Dragados and the Corps. (*See* Opp. Mot. Increase Security Ex. 1A, Email Chain, ECF No. 32-2.) The parties agreed that Great Lakes would remove the cables and place them on the shore for Dragados to pick up at a later date. (*See* Email Chain, Email from Elizondo to Rodriguez 6/30/2011.) They treated the matter as "a differing site condition" or "modification," for which

the Corps agreed to pay a stated hourly rate greater than the contractual line-item price for dredging or removal.  (Email Chain, Email from Rodriguez to Elizondo 6/30/2011.)  Great Lakes removed the cable, as well as other obstructions, on June 30, 2011.  (*See* Quality Control Report 6/30/2011 at 2.)

PREPA alleges that it owns the cable that Great Lakes allegedly damaged and removed. (*See* PREPA Claim ¶¶ 6, 15–17, ECF No. 14.)  Specifically, PREPA owns and operates a 115 kV underground power line, known as the "Lazo Metropolitano Line 38000," in San Juan.  (*See* Mot. Increase Security Ex. A, Pérez Decl. ¶ 5.)  A section of that line runs underwater through the Martin Peña canal, pursuant to a permit granted by the Corps.  (*See id.* at ¶ 6–8.)  In 2011, the Lazo Metropolitano served "as an emergency line should the need [for it] arise or should expansion to the power grid in Puerto Rico be required."  (*Id.* at ¶ 11.)  That need arose in 2013, when a power failure prompted PREPA to attempt to use the line.  (*See id.* at ¶ 15.)  Upon inspection, however, PREPA discovered that the Lazo Metropolitano had been removed and related equipment damaged.  (*See id.* at ¶ 16.)  PREPA traced that loss to Great Lakes' dredging of the Martin Peña canal, (*see id.* at ¶ 20), and informed Great Lakes of its claim in late October 2013, (*see* Compl. ¶ 8, ECF No. 1).

In late April 2014, Great Lakes filed this action, seeking exoneration or limitation of liability.  (*See id.*)  Great Lakes estimated that the maximum value of its Dredge 51 on June 29, 2011, was $4,775,000.00.  (*See id.* at ¶ 13.)  That estimate was premised on the "experience and knowledge" of Great Lakes' senior vice president of mechanical engineering, Steven Becker. (*See* Compl. Ex. A, Becker Decl. ¶ 4.)  And it estimated that the maximum value of the freight pending at the time of the incident amounted to $23,080.00.  (*See* Compl. ¶ 13.)  That estimate

was based on Great Lakes' assertion that, at the time of the accident, it "was operating under an agreement to remove existing underwater obstructions/debris in the Martin Pena Canal," at a specified hourly rate for a maximum of eight hours of work. (*See* Compl. Ex. B, Zimmerman Decl. ¶ 2.)

Consistent with Great Lakes' estimate of the combined value of the vessel and pending freight, it filed alongside its complaint a motion for the court to accept security in the form of three letters of undertaking, worth a total of $4,798,080.00. (*See* Mot. to Accept Ad Interim Stipulations for Value, ECF No. 2.) The court approved that security. (*See* Order, ECF No. 3.)

PREPA subsequently filed its claim. (*See* PREPA Claim, ECF No. 14.) This motion followed.[1]

## ANALYSIS

The Limitation Act, *see* 45 U.S.C. §§ 30501–30512, "allows a vessel owner to limit liability for damage or injury, occasioned without the owner's privity or knowledge, to the value of the vessel or the owner's interest in the vessel." *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 446 (2001). By capping damages, the Act seeks "to encourage ship-building and to induce capitalists to invest money in this branch of industry." *Id.* (quoting *Norwich & N.Y. Transp. Co. v. Wright*, 80 U.S. (13 Wall.) 104, 121 (1871)). Specifically, the Act limits an eligible owner's liability to "the value of the vessel and pending freight," 46 U.S.C. § 30505(a), and authorizes such an owner to initiate an action for limitation in federal court upon notice of a

---

[1] Dragados also filed a claim seeking indemnity from Great Lakes for any judgment PREPA might secure against Drogados. (*See* Dragados Claim, ECF No. 8.) Great Lakes filed a third-party complaint against the United States, also seeking indemnity. (*See* Great Lakes' Third-Party Compl., ECF No. 45.) And PREPA filed a third-party complaint against the United States, alleging negligence in the hiring and supervision of its contractors and breach of contract on the theory that PREPA was a third-party beneficiary of the Corps' contract. (*See* Third-Party Compl., ECF No. 50.) PREPA also amended its claim. (*See* PREPA Am. Claim, ECF No. 55.) The parties have stipulated that neither the addition of the United States to this litigation nor the amendments to the pleadings affect PREPA's motion to increase Great Lakes' security. (*See* Correspondence, ECF Nos. 71, 72.)

claim against the owner, *see* 46 U.S.C. § 30511(a). "In limitation proceedings, the vessel owner is thus interested in setting a low value for its vessel [and pending freight], while the claimants seek a high value." *In re N. Am. Trailing Co.*, 763 F. Supp. 152, 154 (E.D. Va. 1991). The burden of proof lies with the party seeking to limit its liability. *See, e.g.*, *In re W.E. Hedger Co.*, 59 F.2d 982, 983 (2d Cir. 1932).

Where, as here, an owner seeks to limit its liability, it must deposit funds or security with the court equal to the value of the vessel and pending freight, or transfer such assets to a court-appointed trustee. *See* 46 U.S.C. § 30511(b); Supp. Admiralty Rule F(1). A claimant, in turn, may move to increase that security "on the ground that [it is] less than the value of the plaintiff's interest in the vessel and pending freight." *See* Supp. Admiralty Rule F(7).

PREPA invokes that Rule, seeking to more than double Great Lakes' security by moving to increase the fund from under $5 million to $10 million. (*See* Mem. Supp. Mot. Increase Security 20, ECF No. 25-1.) PREPA premises that request on three independent arguments. First, it asserts that Great Lakes' estimate of its pending freight improperly disregarded the value of Great Lakes' subcontract. Second, PREPA claims that Great Lakes failed to include the value of the vessels assisting Dredge 51 in Great Lakes' performance of the subcontract, as the so-called flotilla doctrine allegedly demands. Third, PREPA argues that Great Lakes' valuation of its Dredge 51 lacks sufficient factual support and fails to consider certain legally pertinent factors. Because PREPA's first argument is sufficient to justify increasing the security in this case to $10 million—which is all PREPA requests—the court need not consider the latter two arguments.

*The Main v. Williams*, 152 U.S. 122, 131 (1894), long ago observed that "[t]he real

object" of the Limitation Act's reference to pending freight "was to limit the liability of vessel owners to their interest in the adventure." In the statute, as in "the law maritime, the word 'freight' is used to denote, not the thing carried, but the compensation for the carriage of it." *Id.* at 129. The term thus encompasses "the earnings of the voyage." *Id.* at 131. Likewise, the term "pending" does *not* "limit the recovery to the uncollected freight, or such as had not been completely earned at the time of the disaster." *Id.* at 132. As to both terms, *The Main* rejected narrow constructions, instead indicating that the Act "must be liberally construed against a shipowner." *Phillips v. Clyde S.S. Co.*, 17 F.2d 250, 251 (4th Cir. 1927) (citing *The Main*, 152 U.S. 122).

Where a liability arises during the performance of a non-severable dredging contract, courts consistently conclude that a vessel's pending freight includes the price of the contract. In *In re North American Trailing Co.*, for example, a shipowner sought to limit its liability for damage allegedly arising from the collision of a dredge and a bridge. 763 F. Supp. at 153–54. The court ordered the shipowner to increase security by the value of the dredging contract the vessel had been hired to perform. *Id.* at 163. Although the accident arose "in the early morning . . . during a severe storm," the court reasoned that the vessel was in the area solely to perform the dredging contract and that contract provided for no other services. *Id.* at 153, 162. Likewise, *The Carson* considered a shipowner's efforts to limit liability for the drowning of a crew member who died during the performance of a 20-day dredging contract. 104 F.2d 762, 763, 765 (9th Cir. 1939). The court determined that the vessel's pending freight included the "gross earnings of the dredge" during that 20-day voyage. *Id.* at 765.

By contrast, where a liability arises during the performance of a multiphase contract,

some courts have held that the vessel's pending freight includes only the value of the phase it was performing at the time of the accident. *Collins v. Cottrell Contracting Corp.*, for example, considered "whether the relevant 'voyage'" for a project—which included, with separate line-item pricing, dredging four different channels, improving a dike, mobilization, and demobilization—"consists of the entire multi-phase dredging contract or only a discrete portion thereof." 733 F. Supp. 2d 690, 696 (E.D.N.C. 2010). There, a shipowner sought to limit its liability after a dredge's crewmember was injured while attempting to retrieve a bulldozer from an island, where the shipowner had used it to shape dredging spoils deposited on the island. *Id.* at 694. At the time of the injury, the shipowner had finished dredging three of the four channels, and the parties agreed that retrieving the bulldozer constituted "demobilization" under the contract. *Id. Collins* declined to characterize the value of the entire contract as pending freight, reasoning that only demobilization, "the discrete phase [of the multi-phase contract] at issue," fell within the meaning of that statutory phrase. *Id.* at 697.[2] *Collins* distinguished *North American Trailing* on the ground that that it "make[s] no mention of the kind of multi-phase contract at issue here." *Id.* at 697 n.3. Several unpublished—and thus not precedential—cases similarly restrict the value of pending freight on a multiphase contract to the value of that phase of the contract the shipowner was performing at the time of the alleged accident.[3]

The security Great Lakes has submitted in this case is premised on an improperly meager

---

[2] Because the contract provided no mechanism "for precisely calculating the value of the specific removal of the bulldozer" from the island, however, the court refused to increase the fund by even the value of the demobilization described in the contract. *Id.*

[3] *See, e.g., In re Campbell Transp. Co.*, Civil No. 13-395, 2014 WL 5307924, at *2 (W.D. Pa. Oct. 16, 2014) (holding, where "the master contract consisted of several separate and distinct voyages," that "pending freight must be limited to the particular voyage at issue under the contract, *not* the entirety of the master transportation agreement"); *In re Offshore Specialty Fabricators, Inc.*, Civil No. 01-2227, 2002 WL 827398, at *5 (E.D. La. Apr. 30, 2002) ("Given the distinct phases of the project here, the Court finds that its 'common venture' analysis is applicable to the instant issue and now concludes that the 'voyage' or 'adventure here also refers only to the project's second part.").

estimate of its pending freight.  Because Great Lakes, Dragados, and the Corps treated the electricity cable as a differing site condition—the removal of which earned Great Lakes additional compensation not included in the originally negotiated value of the subcontract, pursuant to a supposed modification of that agreement—Great Lakes now argues that its pending freight is equal to the value of that additional consideration alone.  At the time it submitted its security, Great Lakes calculated the value of that consideration at $23,080.00.  In response to its discovery of an additional document, Great Lakes now acknowledges that the removal of the cable required 11.1 hours of work—rather than eight, as it had originally estimated for the purpose of its calculating its security—and thus revises the value of its pending freight to $32,023.50.  (*See* Opp. Mot. Increase Security 15, ECF No. 32.)

It is undisputed, however, that Great Lakes first encountered the cable on June 29, while dredging the canal, and that it immediately "commenced to pull on the cable with the bucket in an attempt to dislodge it from the dig area"—before the putative contract modification on which Great Lakes premises its estimate of pending freight. (Quality Control Report 6/30/2011 at 2.) And PREPA alleges that those acts damaged the cable and its housing, even before the cable's removal the following day.  But whether or not PREPA ultimately proves such damage occurred before removal, the course of conduct that ended with the cable's destruction began while Great Lakes was dredging the canal pursuant to its subcontract.  Even assuming that *Collins* is correct that pending freight refers only to "the discrete phase [of the multi-phase contract] at issue," 733 F. Supp. 2d at 697, there are at least two phases of the contract at issue in this case—the dredging phase, during which Great Lakes discovered the cable and began pulling on it, as well as the cable's subsequent removal pursuant to a putative contract modification.  Accordingly, the court

concludes that Great Lakes' security must be increased by the contractually stipulated value of that dredging, $7,828,800.00, which Great Lakes omitted from its initial estimate.

The value of Great Lakes' pending freight thus includes at least the contractually stipulated price of the dredging phase of the project ($7,828,800.00), as well as the value of an additional 3.1 hours of labor that Great Lakes now concedes it expended in removing the cable ($8,943.50). The stipulated value of Dredge 51, combined with this new estimate of pending freight, thus rises to $12,635,823.50. That figure exceeds $10 million, which is all the security PREPA presently seeks. (*See* Mem. Supp. Mot. Increase Security 20.) Accordingly, Great Lakes will be ordered to increase its security to $10 million.[4]

## CONCLUSION

For the reasons stated above, PREPA's motion will be granted.

A separate order follows.


June 16, 2015/s/
DateCatherine C. Blake
United States District Judge

---

[4] Because the value of the pending freight is at least sufficient to grant PREPA's motion, the court need not decide whether the value of any other components of the contract—say, the line-item price for removal or turbidity monitoring—should be included in the estimate of pending freight. Nor does the court need to evaluate PREPA's remaining two arguments for increasing Great Lakes' security. PREPA is free to raise those arguments in a subsequent motion, should the need arise.

9